**E-FILED**
Friday, 02 February, 2007  04:23:57 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| LARRY LITTLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-1034 |
| | ) | |
| MITSUBISHI MOTOR | ) | |
| MANUFACTURING OF AMERICA, | ) | |
| Inc., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

### O P I N I O N   A N D   O R D E R

Before the Court is Defendant's Motion for Summary Judgment.  [Doc. 83.]  Plaintiff has filed a Response to Defendant's Motion for Summary Judgment [Doc. 108] and Defendant has filed a Reply to that Response [Doc. 114].

In addition, this Court previously addressed a Motion for Leave in which the Defendant requested that summary judgment motions be filed under seal.  [Doc. 80.]  This Court granted that Motion in part and required that certain non-party employee's names be redacted and replaced with numbers.[1]  [Doc. 81.]  Accordingly, the Court will publish this Opinion and Order to the public and it contains numbers in the place of those names.  At the same time, this Court will enter an un-redacted order under seal [Doc. 121] for purposes of review.

---

[1] The codex relied upon by this Court is available as a sealed document - Doc. 86.

# I.
## BACKGROUND

Before the Court is a suit for racial discrimination in an employment context under 42 U.S.C. § 2000 ("Title VI"), 42 U.S.C. § 1981 §§ 2000e et seq, and 42 U.S.C. 1988. Larry Little ("Little"), an African-American male, is a former employee of Mitsubishi Motor Manufacturing of America, Inc. ("MMNA"). Little's core allegation is that he was the victim of discriminatory policies and practices while employed at MMNA.

Little began working at MMNA on November 13, 2000 as a Group Leader in the Trim Area of Final Manufacturing at MMNA's manufacturing facility. (Doc. 82 at 7, Doc. 108 at 2.) In March of 2002, Little was transferred from the Trim area to the Chassis area of Final Manufacturing. (Doc. 82 at 7, Doc. 108 at 2.) While working in the Chassis area, two incidents occurred which are the focal points of Little's claim – essentially Little was first suspended and later, during a company wide reduction-in-force ("RIF"), Little was terminated.

### a. Suspension

Little received his suspension for violating MMNA's lock-out/tag-out procedures. Lockout/Tagout procedures are special safety measures designed to protect against "hazardous energy." (Doc. 82 at 19-20.) On July 8, 2003 Employee #22, a safety representative, reported seeing Little inside a fenced area

while the power was still activated in violation of MMNA's
Energy Control policy.  Then, on July 9 Employee #22 reported
that Little had directed associates in his area to clean a
conveyor pit during non-production hours without properly
locking and tagging out the area.  (Doc. 82 at 20, Doc. 108 at
3.)  MMNA investigated the incident and at the conclusion of the
investigation, Little received a two day suspension.

Little filed a complaint with OPD claiming that his
suspension was discriminatory. Little did not dispute the facts
but instead argued that he was disciplined for alleged safety
violations while non-black Group Leaders did not receive
discipline for similar offenses. (Doc. 82 at 21, Doc. 108 at 3.)
Specifically, Little now points out that three white employees
violated lockout/tagout procedures and were not disciplined –
Employee #32, Employee #33, and Employee #34. (Doc. 82 at 23,
Doc. 108 at 3.)

MMNA emphasized several facts in response to show that
those Caucasian employees were not similarly situated to Little.
MMNA first points out, and Little does not dispute, that there
were three Caucasian Group Leaders who were also cited for
safety violations, and they received similar discipline.  (Doc.
82 at 22, Doc. 108 at 3.)  Furthermore, MMNA emphasizes, and
Little does not dispute, that there were differences in the
safety violations committed by Employee #32, Employee #33, and

3

Employee #34.  Both Employee #32 and Employee #34's violations occurred in a different area of MMNA's facility.  Both Employee #32 and Employee #33's violations were committed during production hours while Little was suspended for a violation during non-production hours. Employee #34 also held a different position (Superintendent in the Paint Department) at the time of his violation.  (Doc. 82 at 24, Doc. 108 at 3.)  Lastly, it appears to the Court as if all the employees put forward by Little had one safety violation while Little had two violations over a two day period.

### b. Termination

Little's primary claim revolves around his termination. His termination was part of a Reduction in Force ("RIF") program in which numerous employees at MMNA were terminated due to a drop in Mitsubishi's sales volume.  Little was terminated on February 26, 2004 and emphasizes that at the time of his termination there were no actual plans for more terminations. (Doc. 108 at 15, Doc. 114 at 33.)  Furthermore, Little's position at MMNA was not eliminated.  (Doc. 108 at 16, Doc. 114 at 36.)

Employee #11 and Employee #36 were both superintendents and Little's supervisors in the Chassis/Final area of Final Manufacturing at the time of the RIF.  They evaluated the Chassis/Final employees to determine who would be selected for

4

termination using an RIF Evaluation Sheet.  The RIF Evaluation Sheet broke down various elements of an employee's qualifications into specific categories.  These different categories received different weights to determine an employee's final score.  Specifically, 40% came from job-specific competencies, 40% from universal competencies, 10% from relevant work experience, 5% from performance history and 5% from education.

Little received a Total Retention Score on his RIF Evaluation sheet of .42 on a scale of 0 - 2.  This was the lowest score of the 33 Group Leaders evaluated in the Final Manufacturing Department (including both the Chassis/Final area and the Trim/Final area).

Little has emphasized two other employees who were not discharged during the February 2004 RIF.  (Doc. 108 at 30.)  These two Caucasian employees were Employee #10 and Employee #9.[2]

---

[2] There are numerous other employees who are discussed in the various fact patterns presented by the parties.  However, due to this Court's position adopting the mini-RIF analysis (discussed *infra*), it is only necessary to elaborate on the employees Little discusses when arguing that MMNA proffered reason for Little's discharge were pretext.  The only employees Little puts forward when arguing that MMNA's proffered reasons were pretext are Employee #10 and Employee #9.  (Doc. 108 at 31.)  This Court is not about to perform the necessary analysis on any other employees if plaintiff's counsel did not feel it was necessary to perform the analysis in his brief before the Court.  It is not a Court's job to make arguments for a party.  Hershinow v. Bonamarte, 735 F.2d 264, 255 (7th Cir. 1984).  Furthermore, judges are not to wander astray from arguments presented by the

Little emphasizes that both Employee #10 and Employee #9 had been on "performance action plans" within the last year prior to the layoffs because of their poor performance as group leaders.  Correspondingly, they both received the lowest scores possible on the "performance history" portion of their respective RIF evaluations.  (Doc. 82 at Exb. 9.)  While Little received a higher score than both Employee #10 and Employee #9 on his "performance history," they both received overall scores on the RIF evaluation sheet that were higher than Little.

Statistically, this was because Little received a lower score than both Employee #10 and Employee #9 in the area of "Universal Competencies," which was weighted much heavier than performance history (40% versus 5%).[3]  (Id.)  However, of the employees in Little's area, Employee #10 and Employee #9 received the second and third lowest scores ahead of Little.  Later that year, both Employee #10 and Employee #9 were terminated in the October 2004 RIF.  (Doc. 82 at 27, Doc. 108 at 3.)

---

parties because it can diminish the responsibility of lawyers and reduce the competition among them.  Weissman v. Weener, 12 F.3d 84, 86 (7th Cir. 1993).  As a result, it would not be necessary or appropriate for the Court to search through the lengthy fact patterns presented by the parties to conjure up legal arguments regarding other employees when the Plaintiff has failed to do so.

[3] In addition, Employee #9 also received a higher score in the "job-specific competency" category.  This was due to his higher score in the sub-category of "resourcefulness." (Doc. 82 at exb. 9.)

Employee #10 and Employee #9 followed the company policy for completing Little's RIF evaluation.  Specifically, the RIF was a top-down reduction-in-force.  The plan was developed with the assistance of outside consultants.  Under the plan, vice presidents allocated the total number of reductions based on the future business plan for their organization.  (Doc. 82 at 5, Doc. 108 at 2.)  All managers and superintendents performing evaluations for the RIF received specific training on how the RIF evaluation process was going to work, how to identify job specific competencies, how to compete the RIF Evaluation Sheets, what definitions of the various competencies were, what the weighing was for each group of competencies and how to rate employees. (Doc. 82 at 6, Doc. 108 at 2.)  The two heavily weighted categories, "Job-specific Competencies" and "Universal Competencies," had certain sub-categories.  For example, "Universal Competencies" included the following sub categories: "adaptability to change, multi-tasking ability, concern for quality, teamwork, proactive, coaching, communication, developing and releasing people, results oriented, leadership, controlled risk-taking, and EEO/diversity."  It was these certain characteristics that MMNA deemed most important for determining which employees should remain in their trimmed down work force.

Little emphasizes the fact that many of these categories are subjective (Doc. 108 at 19) and could be used to hide racial bias.  However, there were four African-American employees, Employee #13, Employee #14, Employee #56 and Employee #59 who all scored better than Employee #9 and Employee #10 in the area of "Universal Competencies."  (Doc. 82 at exb. 9.)

In addition, it is unclear how much Little's supervisors looked to Little's history with MMNA when evaluating Little. (Employee #11 Deposition at 108-114.)  However, if they did look at Little's history there were numerous complaints brought by fellow employees against Little and there was a claim of battery brought against Little by a female employee.[4]

When the RIF evaluations were completed a total retention score was calculated for each employee based on their score in

_____

[4] MMNA lengthy statement of facts emphasizes at numerous stages that Little repeatedly complained of discrimination when fellow employees complained about him or when he was evaluated. According to MMNA, he had no basis at these times to complain of discrimination.  Nowhere does MMNA discuss Little's numerous allegations of racism in their argument.  As a result, it appears as if MMNA is attempting to portray Little as a man who quickly complains of racism.  The only basis for such a portrayal would be an underhanded attempt to sway this Court into making a credibility determination at the summary judgment stage.  MMNA is fully aware that credibility determinations can not be made by this Court at this time.  Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003).  This Court considers such facts unnecessary and immaterial. Furthermore, by inappropriately attempting to portray Little as a man who unnecessarily complains of racism and making a futile attempt to sway this Court's judgment, MMNA risks this Court questioning MMNA's credibility regarding their otherwise legitimate arguments.

each category.  After superintendents reviewed staff employees below them, MMNA then conducted a peer review process where the superintendents presented their evaluations to a group of their peers; After that process, Little still had the lowest score among the group leaders and was the only group leader in the Final/Chassis area to be terminated in the February 2004 RIF. (Doc. 108 at 17.)

## II.
## LEGAL STANDARD

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case."  Id. at 325.  Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988).

If the moving party meets it burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial.  Celotex, 477 U.S. at 324. Nevertheless, this Court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]."  Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir. 1989).  Summary judgment will be denied where a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995).

### III.
### ANALYSIS

Plaintiff has alleged several acts of racial discrimination and retaliation by the Defendant under both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq* and 42 U.S.C. § 1981.  The Seventh Circuit has ruled that both § 1981 claims and Title VII claims are analyzed in the same fashion. See Eiland v. Trinity Hosp., 150 F.3d 747, 750 (7th Cir. 1998) (citations omitted).  Title VII makes it an unlawful employment

practice for an employer to discriminate against an individual with respect to the terms or conditions of the employee's employment on the basis of her race.  See 42 U.S.C. § 2000e-(2)(a)(1).

Specifically, Title VII makes it an unlawful employment practice for an employer to discriminate against an individual with respect to the terms or conditions of the employees' employment on the basis of his race.  See 42 U.S.C. § 2000e-(2)(a)(1).  "The central question in any employment discrimination case is whether the employer would have taken the same action had the employee been of a different race ... and everything else remained the same."  Carson v. Bethlehem Steel Corp., 82 F.3d 157, 158 (7th Cir. 1996) (per curiam) (citing Gehring v. Case Corp., 43 F.3d 340, 344-45 (7th Cir. 1994)).  To prove racial discrimination, plaintiffs can meet their burden on summary judgment through either the direct method or the indirect burden-shifting method.

In the instant action, Plaintiff has not offered any direct evidence of Defendant's illegal motive in failing to retain him. The Seventh Circuit has defined direct evidence as "evidence that can be interpreted as an acknowledgment of discriminatory intent by the defendant or its agents." Hill v. Burrell Communication Group, Inc., 67 F.3d 665, 667 (7th Cir. 1995) (quoting Troupe v. May Dep't Stores Co., 20 F.3d 734, 736 (7th

11

Cir. 1994). <u>Mojica v. Gannett Co.</u>, F.3d 552 (7th Cir. 1993)
offers an example of such evidence.  In that case, "the
plaintiff was told that she was not promoted because she was not
a black male." <u>Hill</u>, 67 F.3d at 667 (citing <u>Mojica</u>, 7 F.3d at
561).  In the case at bar, Plaintiff does not present any such
evidence.

Accordingly, the Court must analyze Plaintiff's claims
under the indirect evidence burden shifting paradigm established
by <u>McDonnell Douglas Corporation v. Green</u>, 411 U.S. 792 (1973).
Plaintiff must first establish a prima facie case of intentional
racial discrimination.  In order to do this, Plaintiff must
demonstrate:(1) that he is a member of a protected group;(2)
that he suffered an adverse employment action, i.e., demotion or
termination;(3) that he was meeting his employer's legitimate
performance expectations; and (4) that his employer treated
similarly situated employees who were not in the protected class
more favorably.  <u>See</u> <u>Maarouf v. Walker Manuf. Co.</u>, 210 F.3d 750,
752 (7th Cir. 2000); <u>Stalter v. Wal-Mart Stores, Inc.</u>, 195 F.3d
285, 289 (7th Cir. 1999).  However, with regard to cases where a
plaintiff was the subject of a reduction in force, a court can
apply a lower "mini-RIF analysis" which creates a lighter burden
for establishing the forth prong of the <u>McDonnell Douglas</u> test.
<u>Michas v. Health Cost Controls of Illinois</u>, 209 F.3d 687, 693
(7th Cir. 2000).

In this case, MMNA concedes that Little is a member of a protected group and that he was meeting his employer's legitimate job expectations.  (Doc. 82 at 41 n. 9.)  At this stage, MMNA only challenges the second and forth prongs of the McDonnell Douglas analysis.  MMNA first argues that many of Little's claims do not qualify as adverse employment actions (such as reprimands or shift and area transfers).  Next, for those actions that do qualify as adverse employment actions, MMNA argues that the mini-RIF analysis does not apply and that Little cannot establish that similarly situated, non-African-American employees were treated more favorably.  The Court disagrees, the mini-RIF analysis applies and Little can establish a prima facie case. However, there remains the issue regarding pretext which Little must hurdle.  Because Little cannot establish that the proffered reasons for Little's discharge was pretext, Little's case fails the McDonnell Douglas test for establishing a case of unlawful employment discrimination under Title VII.

### a. Non-Adverse Employment Actions

MMNA devotes much of their argument to their position that many of Little's claims do not qualify as adverse employment actions.  Under the applicable law, only those acts resulting in adverse employment actions are cognizable under Title VII.  Oest v. Illinois Dep't of Corrections, 240 F.3d 605, 612 (7th

Cir. 2001).  The definition of "adverse employment actions" has been defined "quite broadly." Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996).  However, adverse actions must be materially adverse to be actionable, meaning more than "mere inconvenience or an alteration of job responsibilities." Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993).  Examples of materially adverse changes include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." Id.

In this case, there is no dispute that Little was both suspended and terminated.  As a result, it is undisputed that both of these actions fall within the category of materially adverse changes in the status of Little's employment. Nevertheless, Little's complaint lists numerous other bases to claim adverse employment actions.  MMNA has chosen to consolidate Little's various additional bases other than suspension and termination into the following categories: 1) the shift and area transfers, 2) the negative performance evaluations, 3) being required to attend interpersonal skills training, 4) reprimands, 5) being required to sign off on daily torque check sheets and 6) alleged harassment by co-workers and

subordinates.  MMNA argues that any of the actions that fit within these categories do not alone constitute grounds for relief.

Little, in his brief before the Court, does not challenge MMNA's position that the grounds listed in the previously noted categories do not constitute adverse actions.  Instead, Little relies on the two areas where he was the subject of adverse actions to survive summary judgment. (Doc. 108 at 29.) Accordingly, this Court holds that the following actions, considered alone, do not constitute adverse employment actions in this case:  1) the shift and area transfers, 2) the negative performance evaluations, 3) being required to attend interpersonal skills training, 4) reprimands, 5) being required to sign off on daily torque check sheets and 6) alleged harassment by co-workers and subordinates.  (Doc. 82 at 40-47.)

However, it is important to note that "even if negative performance evaluations or reprimands cannot, standing alone, state a claim of discrimination, they can constitute relevant evidence of discrimination with respect to other employment actions that clearly are adverse employment actions under the statute." Oest, 240 F.3d 605 at 613; See, Sweeney v. West, 149 F.3d 550, 556 (7th Cir. 1998).

b. Mini-RIF Analysis

Little argues that because his position was not eliminated the appropriate form of analysis is the "mini-RIF" analysis.  In the traditional RIF case, an employer permanently eliminates a position from the workplace. <u>Krchnavy v. Limagrain Genetics, Corp., 294 F.3d 871, 875 (7th Cir.2002)</u>. Under these circumstances, a plaintiff must show that other similarly-situated employees outside the protected class were treated more favorably. <u>Michas, 209 F.3d 687, 693</u>. However, in a mini-RIF case, such as this, employees remaining at the company absorb the duties of their former co-workers. <u>Krchnavy, 294 F.3d at 876</u>. In this situation, the "similarly-situated" requirement is eliminated. *Id.* The Seventh Circuit aptly explained the difference between the two frameworks as follows:

> Because of the fear that employers might misuse the RIF description to recharacterize ordinary termin-ations as reductions in force when they terminate an individual with a unique job, we have dispensed with the requirement that the plaintiff show "similarly situated" employees who were treated more favorably. Instead, because the fired employee's duties are absorbed by other workers and the employee was " 'replaced,' not eliminated," we only require that a plaintiff demonstrate that his duties were absorbed by employees who were not members of the protected class. <u>Michas, 209 F.3d at 693,</u> citing <u>Bellaver v. Quanex Corp., 200 F.3d 485, 495 (7th Cir.2000)</u>.

MMNA argues that the mini-RIF standard does not apply in this case.  Specifically, MMNA cites an unpublished case, <u>Blakely v. Brock Confections, Inc.</u>, No 02-1428, 2003 A.S. App.

16

LEXIS 3373, 9(7th Cir. Feb 21, 2003), to support their position that mini-RIF analysis only applies to "the small subset of employment cases in which an employer fires a single employee." However, the Seventh Circuit has recently noted that the main inquiry is whether a plaintiff's duties were absorbed rather than eliminated, "not the number of individuals terminated." Merillat v. Metal Spinners, Inc., 470 F.3d 685, 691 n.1 (7th Cir. 2006); citing, Paluck v. Gooding Rubber Co., 221 F.3d 1003, 1011 n.5 (7th Cir. 2000).  As a result, it is the Court's duty to focus on whether Little's duties were absorbed by retained employees, not on the numbers of individuals terminated.

In this case, MMNA does not dispute that Little's duties were absorbed by retained employees.  Specifically, Little's position – "F2" - remained after he was terminated on both production shifts.  (Doc. 108 at 16, Doc. 114 at 36.)  Since Little's duties were absorbed by retained employees, the proper form of analysis for the Court is the mini-RIF analysis.

Furthermore, since the retained employees put forward by Little fall outside the protected class, Little has met the forth prong of the requisite McDonnell Douglas analysis under the mini-RIF analysis and has established a Prima Facie case of race based discrimination.  However, as noted *supra*, Little must still establish that the proffered reason's for his discharge was pretext.

c. Pretextual Analysis

Should a plaintiff establish a prima facie case, as in this case, a rebuttable presumption of discrimination is created. The burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its adverse employment decision.  See Johnson v. City of Fort Wayne, 91 F.3d 922, 931 (7th Cir. 1996).  Once the defendant produces a legitimate reason, the burden then shifts to the plaintiff to show that defendant's proffered reason is pretext and that defendant's actual reason was discriminatory.  See id. (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).

In this case, MMNA articulates that the RIF program was a legitimate, non-discriminatory reason for the allegedly biased discharge.  Thus, the burden shifts to Little to show that MMNA's proffered reason is pretext and MMNA's actual reason was his race.

When addressing whether a proffered reason is pretext, the court's only task is to determine whether the defendant "honestly believed in the nondiscriminatory reasons it offered, even if the reasons are foolish or trivial or even baseless." Jackson v. E.J. Brach Corp., 176 F.3d 971, 984 (7th Cir.1999); see also, Balderston v. Fairbanks Morse Engine, 328 F.3d 309, 323 (7th Cir. 2003) ("[A] plaintiff must do more than

demonstrate that the employer made a mistake ...."). The
Plaintiff can show pretext "by showing that the employers
proffered reason was not worthy of belief." Gordon v. United
Airlines, Inc., 246 F.3d 878 (7th Cir. 2001); citing, Sanchez v.
Henderson, 188 F.3d 740, 746 (7th Cir. 1999).

In the case at bar, Little emphasizes the fact that
Employee #10 and Employee #9 were placed on performance action
plans. Plaintiff puts forward the following argument as grounds
for pretext:

> Employee #11 "ranked" Employee #10 and Employee
> #9 ahead of Larry Little – despite both of their jobs
> having been on the line within months of making the
> ranking determinations. Both Employee #10 and
> Employee #9 had been placed on plans to improve their
> performance. The failure to comply with the plan
> could lead to discharge. The action plan was supposed
> to be completed within 90 days. Employee #9 was
> placed on his plan on May 6, 2003; should have
> completed it no later than on or about August 6, 2003;
> and still had a job when he was taken off his plan on
> September 3, 2003…. Of even more interest is the fact
> that the stated reason for taking Employee #9 and
> Employee #10 off their improvement plans was the
> result of their "bridge period" evaluations. These
> evaluations cover the period of January through March
> of 2003. Both of these gentlemen had already worked
> through their bridge period and beyond, when they were
> placed on action plans because their performance was
> so abysmal. However, both somehow managed to have
> "met" bridge period evaluations. Larry Little, on the
> other hand, was never put on a performance improvement
> plan. One might expect that to of occurred if he was
> the worst group leader in the final manufacturing area
> of the plant. The rankings are inconsistent with the
> performances of Employee #9 and Employee #10. (Doc.
> 108 at 31-32.)

First it is necessary to look at MMNA's alleged failure to terminate Employee #9 when he was on a performance action plan in 2003.  Based upon Little's argument, implicitly, if an employee was not off of an action plan within 90 days they were to be terminated.  In this case, Employee #9 was allegedly on an action plan for longer and should have been terminated before the February 2004 RIF.

First, the connection between Employee #9's alleged mistaken retention and Little's termination is attenuated. Employee #9 could have been terminated in 2003 and Little still would have received the lowest score on the 2004 RIF and been terminated.  Nevertheless, even assuming that such an action would have worked in Little's favor, Little does nothing but show that MMNA made a mistake in retaining Employee #9 in 2003. "'Pretext' for purposes of determining whether an employee has established that an employer's proffered legitimate, nondiscriminatory reason is pretextual in a Title VII action, is more than a mistake on the part of the employer; it is a phony excuse." Hudson v. Chicago Transit Authority, 375 F.3d 552, 561 (7th Cir. 2004).  If Little was fired because he was still on an action plan after 90 days, then Employee #9's case might be evidence that Little's termination was a phony excuse.  However, in this case, the fact that Employee #9 was not terminated does

not show that Little's RIF was a pretextual excuse for Little's termination.

Little's other argument is that both Employee #10 and Employee #9 were on action plans and thus, Little's scores on his evaluation were pretextual. However, under the RIF evaluation plan, Employee #10 and Employee #9 received the lowest score possible on past performance. However, past performance was only worth 5% of an employee's overall score. The area that sets Little apart from Employee #10 and Employee #9 was "Universal Competency." Included in the "Universal Competency" category were certain sub-categories for which Little received the lowest score. Namely, Little received the lowest score in "adaptability to change," "multi-tasking ability," "teamwork," "proactive," "coaching," "leadership," and "risk taking." Little emphasizes the fact that many of these categories are subjective (Doc. 108 at 19) and could be used to hide racial bias. In response, MMNA points out that four African-American employees, Employee #13, Employee #14, Employee #56 and Employee #59 all scored better the Employee #9 and Employee #10 in the area of "Universal Competencies."[5] (Doc. 114

---

[5] MMNA also unnecessarily emphasizes the fact that Employee #10 and Employee #9 (as well as other similarly situated employees) were terminated in the October 2004 RIF. This is an attempt to persuade this Court that Little was treated the same as Employee #10 and Employee #9. (Doc. 82 and 114.) MMNA does not put forward any case law from which this Court could conclude that

at 58, Doc. 82 at exb. 9.)  However, this Court notes that the
key detail is not the fact that other African-African American
employees had higher scores than Employee #10 and Employee #9 in
the "subjective" categories.  Instead, the key fact is a lack of
evidence to support Little's position that MMNA could not have
believed the scores which Little received in the subjective
categories.

The Court certainly is not going to question MMNA's
decision to evaluate employees based upon subjective categories.
"It is not our role to question the wisdom of a company's
decisions on how to run its business." Johal v. Little Lady
Foods, Inc., 434 F.3d 943, 946 (7th Cir. 2006).  In particular,
when addressing whether a reduction in force was pretext, courts
have noted that "[i]n a reduction in force, someone has to go.
It is usually the least qualified or least productive employee."
Fairchild v. Forma Scientific, Inc., 147 F.3d 567, 573 (7th
Cir.1998).  In the case at bar, the Court will not question MMNA

employees who are terminated more than six months apart received
similar treatment.  Keeping one employee on over another for six
months for racial reasons would certainly be unlawful.
Furthermore, when courts have faced employees who were
terminated six months apart, courts have not relied upon that
fact to show an absence of discriminatory treatment.  Brown v.
Sybase, Inc., 287 F.Supp.2d 1330 (S.D.Fla., 2003).  Accordingly,
this Court believes that keeping one employee on over another
for an additional seven months is not equal treatment.  If
Little was treated differently due to his race, then the fact
that Employee #10 and Employee #9 were terminated in October
rather than February would only go to the measure of Little's
damages, not to MMNA's liability.

for choosing subjective categories for determining which
employees to retain, even if those categories are somewhat
ethereal qualities like "leadership," "proactive," or "multi-
tasking ability."

Once again, the only evidence Little puts forward on this
point is Employee #10 and Employee #9's "performance improvement
plans," from which Little would like this Court to conclude that
Employee #10 and Employee #9 had performance histories which
were worse than Little's.  (Doc. 108 at 32.) Assuming this is
true, Little's superior performance history was recognized in
his RIF evaluation score and he received a higher score than
both Employee #10 and Employee #9 in the category of
"Performance History."  The fatal flaw in Little's case is that
he has no evidence that Little's superiors could not have
believed the scores which they gave him on the more subjective
categories.[6]

Specifically, Little does not present any evidence that
MMNA's subjective requirements were disingenuous or
inconsistently applied.  Perfetti v. First Nat. Bank of Chicago,
950 F.2d 449, 457 (7th Cir. 1991); citing Coston v. Plitt
Theatres Inc., 831 F.2d 1321, 1236 (7th Cir. 1987).  Nor does

---

[6] Such evidence could include statements from other supervisors
or fellow employees that ranking Little so low on these
subjective categories is absurd and unbelievable.  Little brings
forward no such evidence.

Little present any evidence that MMNA could and should have evaluated Little's subjective skills with objective criteria. <u>Perfetti</u>, 950 F.2d at 457; <u>citing</u> <u>Christie v. Foremost Ins. Co.</u>, 785 F.2d 584, 586-87 (7th Cir. 1986).  Last, Little does not bring forward any evidence that MMNA's decision was arbitrary because of a failure to investigate more thoroughly.  <u>Perfetti</u>, 950 F.2d at 457; <u>citing</u> <u>Tye v. Board of Educ. Of Polaris Joint Vocational Schoo Dist.</u>, 811 F.2d 315 (6th Cir. 1987), <u>overruled on other grounds</u>, <u>Kline v. Tennessee valley Authority</u>, 128 F.3d 337, 343 (6th Cir. 1997).[7]

Accordingly, even though Little's performance may have been satisfactory, it does not mean that his termination as part of an RIF was discriminatory.  <u>Merillat</u>, 470 F.3d 685, 694; <u>See also</u>, <u>Balderston, 328 F.3d at 324</u> (holding that the plaintiff did not demonstrate pretext when there was no evidence to show that the employer "did not honestly believe [it] was dismissing a poorer performing, less suitable" employee in a RIF).  As a result, Little has failed to meet the difficult burden of showing that MMNA's proffered reason for Little's termination

---

[7] Meanwhile, there certainly is applicable evidence to the contrary that could show that Little's superiors correctly evaluated his subjective employment qualities.  Specifically, there are the numerous complaints that employees under Little filed against him as well as the one accusation of battery leveled against him by a female employee.  (Doc. 82 at 14-16, Doc 108 at 2-3.)

24

was pretext and the Court must grant summary judgment in MMNA's favor.

### Harassment and Retaliation Claim

MMNA, in their motion to dismiss also challenges Little's harassment and retaliation claims.  Little does not raise any argument in response to this challenge.  Arguments not raised are waived.  Taubenfeld v. AON Corp. 415 F.3d 597 (7th Cir. 2005); Heller v. Equitable Life Assurance Soc'y, 833 F.2d 1253, 1261-62 (7th Cir. 1987).  Accordingly, MMNA is granted summary judgment against Little's claims of harassment and retaliation.

### CONCLUSION

IT IS THEREFORE ORDERED that MMNA's Motion for Summary Judgment (Docs. 82 and 83) is GRANTED.

CASE TERMINATED.

ENTERED this  2nd  day of February, 2007.

                                    s/Joe Billy McDade_____
                                    Joe Billy McDade
                              United States District Judge